# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| E-STEPS, LLC,<br><br>     Plaintiff,<br><br>          v.<br><br>AMERICAS LEADING FINANCE, LLC;<br>TRAKSECURE CORP.; CENTERBRIDGE<br>PARTNERS, LP; NICOLAS KOGAN, JANE<br>DOE; CAROLA ACUM, JOSÉ CORREA,<br>RACHEL ROE; RICARDO CRUZ, SUSAN<br>DOE; JOSÉ ORTEGA, MARY ROE;<br>VICTOR GARCIA PORRATA, SUSAN ROE;<br>LUIS O'FARRIL, JANE ROE and their<br>conjugal partnerships; CORPORATION ABC,<br>PARTNERSHIP DEF, LIMITED LIABILITY<br>COMPANY GHI, | **Civil Num. 20-**<br><br>**COPYRIGHT INFRINGEMENT;<br>TRADE SECRETS<br>MISAPPROPRIATION;<br>COMPUTER FRAUD AND<br>ABUSE ACT;<br>BREACH OF CONTRACT;<br>TORTIOUS INTERFERENCE**<br><br>**[DEMAND FOR JURY]** |

# COMPLAINT

**TO THE HONORABLE COURT:**

NOW COMES E-STEPS, LLC, [e-STEPS] by and through the undersigned attorneys, and very respectfully states and prays as follows:

## INTRODUCTION

Americas Leading Finance, LLC [ALF] is a company that bills itself as the company that gives its clients a second chance. Of course, when you lend money to folks who did not get it right the first time, you run the risk that said folks default again on their obligations.

To stave off such risks, ALF started to look into the market for a software solution that would provide the tracking of a motor vehicle using Global Positioning System [GPS] technology. The innovative use of this technology to assist in the repossession of vehicles allowed ALF to be the first financial institution in Puerto Rico to use it. Codefendant TRAKSECURE provided ALF with a proposal, but inflated the numbers, believing

that its personal relationship with at least one of ALF's officers would make them swallow the inflated cost.

TRAKSECURE was mistaken, and ALF sought other alternatives, ultimately choosing to enter into a contract to license e-STEPS' solution comprised of its proprietary software, and/or trade secrets and other intellectual property subject to confidentiality clauses [the protected work]. Under the contractual arrangement between e-STEPS and codefendant ALF, in addition to selling the GPS units, e-STEPS licensed its proprietary tracking software. But since this was an innovative solution and ALF had never tracked a single vehicle before, e-STEPS quickly realized that there ALF needed far more than just the tracking of a vehicle and plotting its location on a map.

e-STEPS proposed to ALF the further development of e-STEPS' platform at no extra cost to ALF under the condition that all the work developed by e-STEPS would be e-STEPS' property. ALF agreed. e-STEPS sought to protect itself with a sufficiently long term on the contract to assure a just yield on its significant investments in improving ALF's business by reengineering, identifying, functionalizing, structuring, designing and ultimately coding business processes that e-STEPS itself created with originality sufficient to be copyrighted. ALF did not have the technical capability to create the business processes to integrate the GPS technology with its lending process and the subsequent monitoring of the loan recipient. e-STEPS created that capability. It took e-STEPS almost a year of work and a considerable monetary investment to create an original integrated platform for ALF to market its financing products to car dealers, integrating the installation of GPS units in vehicles with the vehicles' sale and then providing for the monitoring of the debtors' vehicles.

TRAKSECURE, however, remained, lurking, and several months into e-STEPS' contract with ALF, the latter informed e-STEPS that ALF's investors, codefendant CENTERBRIDGE PARTNERS, required that ALF diversify its tracking systems' providers. e-STEPS objected, but ALF assured e-STEPS that its protected work was protected. As it turned out, the diversification consisted of none other than ALF providing TRAKSECURE with e-STEPS' protected work.

ALF did so to be able to cancel its contract with e-STEPS once TRAKSECURE was able to offer a substantially similar solution and service once ALF provide TRAKSECURE with e-STEPS' trade secrets. Furthermore, **ALF itself** used e-STEPS' protected work to reproduce technologies offered under the contract with e-STEPS to track vehicles and use this technology on debt collection efforts, thereby violating the license of use, exceeding the authority granted under the license to obtain something of value from e-STEPS, breaching its contract with e-STEPS and infringing e-STEPS copyright. Once e-STEPS realized that ALF had given its trade secrets to TRAKSECURE in violation of the Defend Trade Secrets Act, e-STEPS registered that intellectual property – the secrecy of which had been violated – to be able to enforce its ownership rights to its intellectual property.

e-STEPS files this Complaint to ask this Court for all the remedies it is entitled to under 17 U.S.C. §501 *et seq.*, to order impoundment and destruction of all infringing materials and trade secrets pursuant to 18 U.S.C. §§ 1831-1839 [the Defend Trade Secrets Act] , to ask for all remedies it is entitled to under the 18 U.S.C. § 1030 *et seq.* [Computer Fraud and Abuse Act] and to award  e-STEPS actual damages, doubled pursuant to the Defend Trade Secrets Act, infringers' profits, and costs and attorneys' fees. e-STEPS also asks this Court to exercise its supplemental jurisdiction to order defendants to stop using and to return e-STEPS' protected confidential information and to destroy any copies in their possession. e-STEPS finally sues for damages due to the tortious interference with e-STEPS' contractual relationships and for the breach of its contract with ALF.

## I.     JURISDICTION AND VENUE

1.     This Court has federal question jurisdiction over this case under the Copyright Act 17 U.S.C. § 101 *et seq.* as well as supplemental jurisdiction to address the state law contract claims.

2.     This Court has also federal question jurisdiction over this case under the Defend Trade Secrets Act of 2016 (DTSA), which on May 11, 2016 significantly amended the Economic Espionage Act (EEA) (18 U.S.C. §§ 1831-1839) to provide federal jurisdiction over appropriation of trade secrets used in or intended for use in interstate or foreign commerce.

3.   This Court has federal question jurisdiction over this case under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4) and § 1030(g).

4.   This Court has supplemental jurisdiction over the tortious interference and breach of contract claims.

5.   Venue is proper in this Court because the causes of action took place in Puerto Rico and all parties are domiciled in Puerto Rico.

## II. THE PARTIES

6.   e-STEPS, LLC is a limited liability company registered to do business in Puerto Rico.

7.   Americas Leading Finance, LLC is a limited liability company registered to do business in Puerto Rico, which contributorily infringed e-STEPS' copyrights and/or misappropriated its trade secrets, and breached its contracts. It also conspired with the other Defendants to achieve the same result.

8.   NICOLÁS KOGAN is the founder and chief executive officer of ALF, who participated actively in the infringement of e-STEPS' copyrights, substantially encouraged or assisted such infringement and/or misappropriated its trade secrets. On information and belief, Jane Doe is his wife, and they form a conjugal partnership.

9.   CAROLA ACUM is the chief operating officer of ALF, who infringed e-STEPS' copyrights, substantially encouraged or assisted in such infringement and/or misappropriated its trade secrets.

10.  JOSÉ CORREA is the chief of the Information Technology department at ALF. He contributed to the infringement of TRAKSECURE but also infringed on behalf of ALF to reproduce technologies offered by e-STEPS under the contract and develop internal computer programs or tools to track vehicles and to conduct collection efforts with clients. He substantially encouraged or assisted such infringements. On information and belief, Rachel Roe is his wife, and they form a conjugal partnership.

-4-

11. RICARDO CRUZ was, at the time of the facts claimed in this complaint, the Business Development Director at ALF and was the direct SUPERVISOR of Mr. Javier Robles, employee of ALF in charge of handling all aspects related to Total Control GPS© (e-STEPS' platform). In that role, he instructed Mr. Robles to provide TRAKSECURE with the structure, sequence, organization and specification of Total Control GPS©, all of which are protected non-literal elements of the software, thereby instructing Mr. Robles to infringe and contribute to the infringement conducted by TRAKSECURE. On information and belief, Susan Doe is his wife, and they form a conjugal partnership.

12. JOSÉ ORTEGA was, at the time of the facts claimed in this complaint, Head of Collections at ALF. On or around October 2016, ALF decided to move the GPS project from under the Business Development Department oversight and place it under the Collections Department. ORTEGA, in his role of Head of the department instructed Mr. Javier Robles to continue communicating non-literal elements of the protected Total Control GPS© software, but added a literal output in the form of a *Certificate of Installation* copyrighted by e-STEPS. He also infringed or breached the contract with e-STEPS or both on behalf of ALF by causing the reproduction of confidential technologies offered by e-STEPS under the contract and the development of internal computer programs or tools to track vehicles and conduct collection efforts with clients. He substantially encouraged or assisted such infringements or misappropriated e-STEPS' trade secrets or both. On information and belief, Mary Roe is his wife, and they form a conjugal partnership.

13. TRAKSECURE, CORP. is a Puerto Rico corporation that directly infringed e-STEPS' copyrights through illegal disclosures made by ALF of e-STEPS' protected work.

14. VICTOR GARCIA PORRATA is the chief executive officer of TRAKSECURE, who participated actively in the infringement of e-STEPS' copyright. On information and belief, Susan Roe is his

wife, and they form a conjugal partnership.

15. LUIS O'FARRIL is the engineer in TRAKSECURE who participated actively in the infringement of e-STEPS' copyright. On information and belief, Mr. O'Farrill is married to Jane Roe, and they form a conjugal partnership.

16. CENTERBRIDGE PARTNERS, LP is a New York limited partnership that vicariously infringed e-STEPS' copyrights. CENTERBRIDGE, at the time of the facts claimed in the complaint, was, *inter alia*, an investor in ALF who purchased its auto loans. The relationship between CENTERBRIDGE and ALF makes the former a supervisor or overseer of the latter who had the right and ability to supervise the infringing conduct. In addition, CENTERBRIDGE had a direct financial interest in the outcome of the infringement as it directly related to the collateral of the auto loans it purchased. Moreover, CENTERBRIDGE paid ALF in advance for the purchase of the GPS units installed in the vehicles.

### III. THE FACTS

### E-STEPS' OWNERSHIP OF VALID COPYRIGHTS AND THEIR DESCRIPTION

17. e-STEPS owns a valid copyright over the platform known as Total Control GPS©, that links individuals to the vehicles ALF finances; locates those vehicles as needed; and tracks vehicles as needed, using GPS technology. *See* Exhibit 1, Contract between e-STEPS and ALF at 1, first paragraph "WHEREFORE;" and Exhibit 2, copyright registration TX 8-679-684.

18. e-STEPS also owns a valid copyright over the platform's functional specifications and a *Certificate of Installation* produced by the platform. *See* Exhibit 3, copyright registration TX-706-911, and Exhibit 4, copyright registration TX-733-463.

19. The Total Control GPS© platform is a specific *automotive tracking resource and business process management* platform with integrated:

    a. Coordination of loan applications, auto loan financing institutions, and vehicle

dealerships;

    b.   Creating and managing resources and documents to facilitate and memorialize the physical process of installing a GPS unit into a vehicle (including installation service ticket management and generation of an electronic certificate document);

    c.   Associating vehicles (via vehicle identification number (VIN)), GPS units, and auto loan numbers;

    d.   Integrating GPS tracking with said resources and documents; and

    e.   Providing other associated supporting services (such as billing and reporting). *See* Exhibit 5, Expert Witness Affidavit in Support of Complaint, ¶ 34, page 13.

20.    There are several GPS tracking programs in the market, but Total Control GPS© is more than just "tracking software".

21.    e-STEPS also owns the infrastructure necessary to track vehicles via computer and/or cell phone with equipment, platforms, and networks. *See* Exhibit 1, the Contract between e-STEPS and ALF at 1, first paragraph "WHEREFORE;"

22.    e-STEPS operates the system and its infrastructure as an essential part of its business. Id.

## THE CONTRACT BETWEEN E-STEPS AND ALF AND ITS BACKGROUND

23.    On or around the first half of 2015, ALF needed a GPS tracking system for the vehicles it intended to finance and decided that because it lacked the expertise and proper means, instead of developing a software solution in-house, it needed to outsource the work.

24.    ALF then asked TRAKSECURE for a proposal.

25.    TRAKSECURE's president, codefendant Víctor García Porrata, found out that one of ALF's officers in charge of evaluating the proposal, Juan Ramon (Moncho) Gutierrez Rodriguez was an acquaintance of his and inflated the numbers on the proposal and its potential profit.

26.    Mr. Gutierrez noticed the change, notified the members of the evaluating committee, all of whom

agreed to reject the proposal with the inflated numbers.

27.   Mr. Gutierrez suggested looking for another provider and contacted e-STEPS.

28.   TRAKSECURE lost the business and resented it.

29.   Next, ALF's officer sought recommendations and was directed to e-STEPS, which prepared a proposal based on ALF's top officers' representations about volume of vehicles that would need to be tracked and representations based on business projections of ALF's financing market.

30.   ALF entered into a contract with e-STEPS on June 18, 2015 to provide a complete Information Technology (IT) solution to track the spatial location (latitude and longitude via Lambert coordinates using the GPS technology) of motor vehicles that served as liens to the loans that ALF had made to its clients.

31.   ALF was, at the time, the only financial institution in Puerto Rico that used GPS technology to track vehicles that serve as collateral to the auto loans.

32.   In turn, the solution developed by e-STEPS, comprised of its source code, object code, the structure, sequence, and organization of both the program as an integrated whole and the program's individual elements, *i.e.,* its modules, subroutines, macros, module substructure (the nesting of one module within another); the control flow (the sequence in which modules perform their tasks), files, data flow (the sequence in which data moves through the program and is operated on by the modules) and the user interface (data input formats and other non-graphical, internal code that enables the user and computer to communicate with one another and result in certain output formats and reports), became a **competitive advantage** that e-STEPS painstakingly gained over its competitors, among them the disgruntled codefendant TRAKSECURE.

33.   e-STEPS intended to market its trade secrets described in the prior paragraph to other clients in Puerto Rico and throughout the continental United States.

34.   Even though in June 2015 the Total Control GPS© platform was not fully developed to what the

platform is today, e-STEPS, recognizing the opportunity to obtain such competitive edge through its creation, took reasonable measures to protect its current and future asset.

35.     e-STEPS then granted ALF a restricted technology use license which prohibited ALF from reproducing in any way the technologies offered under the entire agreement. *See* Exhibit 1, the contract at 4.

36.     e-STEPS also incorporated to the agreement a previously signed Non-disclosure agreement with ALF that protected Confidential Information, as such term was therein defined, from being disclosed by ALF to anyone else. *See* Exhibit 1 at 6 and Exhibit 6 (Mutual Confidentiality Agreement)

37.     In June 2015, ALF signed the contract with e-STEPS by which the latter would **sell** to ALF the GPS units that e-STEPS would then install in the vehicles, which ALF then financed to the purchasers.

38.     e-STEPS initially purchased and brought the GPS units from California and subsequently imported the units to Puerto Rico from China through interstate and then foreign commerce.

39.     Under the contract, e-STEPS was also to provide ALF with a service that would enable locating the financed vehicles using GPS technology, which used equipment, platforms, and networks necessary to track the vehicles via computers and the cellular network. *See* Exhibit 1, the second paragraph of the WHEREFORE clause.

40.     When the GPS technology tracked the vehicles, the GPS unit on the vehicle sent a signal to a satellite that then returned the information as to the vehicle's location to ALF.

41.     Therefore, the contract was called in Spanish: "CONTRATO DE VENTA Y SERVICIO DE LOCALIZACIÓN POR POSICIONAMIENTO GLOBAL ("GPS") PARA LA RECUPERACIÓN DE VEHÍCULOS". Exhibit 1, the entire contract, Contract for the Sale and Servicing of Global Positioning Systems (GPS) for Vehicle Recovery.

42.   The complete solution had a both buy-and-sell component and a monthly service lease component and used e-STEPS' trade secrets, as ALF recognized.

43.   Under the contract, ALF agreed to buy GPS units from e-STEPS, which e-Steps brought to Puerto Rico through foreign and interstate commerce that e-STEPS would install on motor vehicles on-site at the dealership.

44.   ALF's clients consented on a preprinted form in which ALF represented that the only valid use of the GPS data would be to recover the vehicle only if the loan agreement had been defaulted according to ALF's loan agreement terms.

45.   Upon being instructed to do so by ALF, e-STEPS would install the GPS unit on the vehicle and would activate it on a third-party M2M [machine to machine] mobile network for a fixed fee of $12.00 per GPS unit.

46.   As part of the service lease, e-STEPS granted ALF a limited use license of e-STEPS' Total Control GPS©.

47.   The cost for the use of e-STEPS' platform was $3.99 a month with the right to obtain 32 vehicle locations from the internet in any given month.

48.   Thus, an integral part of the agreement between e-STEPS and ALF was the use of a software platform developed originally and entirely by e-STEPS, comprised of literal and non-literal elements protected under the Copyright Act.

49.   e-STEPS invested money, time, and effort to develop its work and took specific measures to protect it via contractual protections, a non-disclosure agreement, and copyright registration.

50.   In addition, e-STEPS protected its trade secrets comprised, among other things, of non-public information, sensitive information, processes, know-how, designs, diagrams, software, contracts with its third-party suppliers, and technologies offered as part of the agreement with ALF.

51.   e-STEPS took reasonable measures to keep its trade secrets confidential.

52. The contract's term was 18 months, which would renew automatically unless one of the parties notified the other at least 90 days before the end of the original term of its intention not to renew the contract. *Id.* at 3.

53. After the end of the first term of the contract at the end of 2016, it was renewed automatically for another 18 months ending on June 18, 2018, when it was renewed again.

54. The contract was due to end on December 18, 2019.

55. e-STEPS granted ALF a restricted technology use license which prohibited ALF from reproducing in any way the technologies offered under the entire agreement. *See* Exhibit 1 at 4.

## TOTAL CONTROL GPS© – ORIGINAL CREATION AND DEVELOPMENT BY E-STEPS

56. When e-STEPS contracted with ALF, ALF had never tracked a vehicle, nor ever used GPS technology to track vehicles, nor created business processes to accomplish this objective.

57. Therefore, tracking vehicles and everything related to this goal, had to be created from scratch by e-STEPS.

58. When the contract began, e-STEPS had to create and provide ALF with processes from which it then derived in a separate creation stage, non-literal elements and functionalities for the software that it incorporated through the contracted license to the service platform with certain components necessary for the tracking of vehicles.

59. Thus, the basic tracking module was developed fairly quickly and deployed as an initial version of Total Control GPS©.

60. e-STEPS quickly improved on the initial module by implementing modules and functionalities original and specific to e-STEPS' automotive tracking resource and business process management platform.

61. One of the most critical, foundational aspects of a software process is the need to develop a so-called specification or "requirements", which express how the software should behave or work.

62.   Requirements are needed to inform engineers of everything from the largest of matters to the smallest of details in order for the project ideas and concepts to be translated into computer code. *See* Exhibit 5, Expert Witness Declaration in Support of Complaint, ¶35, page 14

63.   In some cases, these requirements may be readily available, perhaps because the project is simple or there is a precedent for the software.

64.   In other cases, when there is less precedent for the software, great effort in terms of **time and cost** must be invested to create the requirements, this is called *requirements engineering*. *Id.*at ¶24, pages 10, 11.

65.   *Requirements engineering* necessitates identifying all aspects of the system, including both the functional (e.g. features) and non-functional (e.g. performance, security, etc.) aspects as to how the system should work and what it must do. *Id.*

66.   Even for organizations and software projects of moderate size, this process can involve months or years of collaboration between numerous so-called stakeholders (business owners, product managers, software engineers, designers, users, customers, vendors, etc.) *Id.*

67.   ALF had no requirements and never gave any to e-STEPS for the development of the Total Control GPS© platform.

68.   The end result of the requirements is the developer's expression of the structure, sequence and organization (commonly known as SSO) of the specific software solution.

69.   With the expression of the structure, sequence and organization there is only one more element to finish the software and that is coding.

70.   The software developer having created the structure, sequence, and organization of the software solution will then create the source code and finally the object code.

71.   Through forward thinking and targeting the development of a powerful unique tool for the Subprime Auto Loan Market, e-STEPS created these software requirements to incorporate

original expressions of new elements, such as: modules, tangible output, and integration among the different elements, principal or ancillary, required to originate the auto loans marketed by ALF and eventually install the GPS units and provide the vehicles' GPS location.

72.    The end result is the current Total Control GPS© platform as it stands today, composed of the following modules and outputs:

(a) **GPS Installation.** This module encompasses tracking various business steps and events to confirm that GPS units were installed. Units are installed on vehicles that are sold by a dealer to a buyer, financed by a bank loan. GPS units are installed by a mechanic at a given location. The mechanic further associates a vehicle condition report with the installed GPS.

(b) **Condition Report** permits an Installation Expert (e.g, a mechanic) to report the condition of a vehicle during the installation of a GPS unit. A condition report includes mileage, photos, the license plate, vehicle color, the external and internal condition, and any additional details or photos. This condition report validates data provided by the dealer.

(c) **Reporting**. There are a number of reports pertaining to the user's fleet of vehicles and GPS installations. Plaintiff provides more detail below in the Reporting web portal.

(d) **Ticket Management**. This module is used to track the process and progress of a request for a GPS unit to be installed in a dealer's vehicle. It enables communication between the financier, the dealer, and the installation expert. The module automates the process of creating a request; servicing the request; and conforming installation has been completed.

(e) **GPS Tracking**. This module is used to track the location, speed and direction of fleet vehicles actively or passively once they have been purchased and serviced using the GPS Installation and other modules above. It also maintains historical information as to vehicles' whereabouts.

(f) **Billing**. The billing module is used to track the various costs and invoicing pertaining to GPS units; GPS unit installation; GPS unit monthly connectivity; GPS tracking service; GPS unit removal; and GPS unit reuse. The module includes the ability to calculate a monthly bill, with details of the GPS units installed, and servicing details for audit purposes.

(g) **Certfication**. This module is used to confirm and certify a GPS installation. e-STEPS created the Certificate with details required for the pay-out process of the bank. The Certificate confirms that the GPS was installed and is active.

73.   **The Proprietary software (Total Control GPS©) and its unique functionality are among e-STEPS' most valuable assets**.

74.   e-STEPS,  conscious of the investment that it was incurring without any cost to ALF, relied on the protections that it had framed under the contract, namely the clause which prohibited ALF from reproducing the technologies provided under the contract and the non-disclosure/confidentiality clauses incorporated in the contract that prohibited ALF from disclosing e-STEPS' trade secrets, as well as other confidential information. *See* Exhibit 6, Mutual Confidentiality Agreement between e-STEPS and ALF.

75.   e-STEPS also relied on its valid copyrights once it became clear that ALF had disclosed its trade secrets.

## THE INFRINGEMENT – BACKGROUND

76.   On or about May 2016, almost a year after e-STEPS and ALF signed their contract, codefendant

NICOLÁS KOGAN, ALF's founder and CEO, told e-STEPS that codefendant CENTERBRIDGE PARTNERS, ALF's investors and buyers of auto loans, had requested that another company be contracted to provide the same intellectual property e-STEPS provided with the necessary requirements engineering.

77. The company would have to sell GPS units to be installed in vehicles and had to offer a monthly tracking service for those GPS units.

78. E-STEPS opposed such a move by ALF, but KOGAN assured e-STEPS that it did not have anything to worry about because ALF was well aware of the contractual obligations that protected e-STEPS platform and work.

79. E-STEPS reasonably relied on that representation.

80. KOGAN further justified its move by saying that they wanted to have a second provider so as to not "put all their eggs in one basket".

81. The company was no other than TRAKSECURE, the competitor that had lost the contract to e-STEPS the first time around.

82. ALF and TRAKSECURE signed a contract which is virtually identical to that between e-STEPS and ALF, except for certain names and dates. *See* Exhibit 7 and compare to Exhibit 1.

83. On information and belief, ALF conditioned its agreement with TRAKSECURE and stated that the tracking services provided by TRAKSECURE had to be the *same* as those provided by e-STEPS with the *same* platform behavior and outputs, THEREFORE following the *same* requirements that e-STEPS had originally created and designed as part of the technologies offered under its contract with ALF.

84. ALF, KOGAN, ACUM, CORREA, CRUZ and ORTEGA knew, or should have known, that such conditions violated the confidentiality provisions of its contract with e-STEPS, the protection against disclosing trade secrets, the prohibition of reproducing technologies offered under the

contract and ultimately violated e-STEPS' copyrights.

85. Likewise, CENTERBRIDGE PARTNERS knew, or should have known that the only way for TRAKSECURE to become an additional provider of the complete spectrum of GPS tracking services from loan origination to repossession was for ALF to provide TRAKSECURE with e-STEPS' protected work.

86. So, this was the golden opportunity for TRAKSECURE to fulfill its frustrated first attempt to obtain a piece of ALF's business.

87. But TRAKSECURE had a big problem.

88. TRAKSECURE only had an out-of-the-box solution that just passively tracked the vehicles and did not have any other modules, functionalities, or the aesthetic appeal that e-STEPS' platform had.

89. Once TRAKSECURE's "system" started operating in mid-2016, ALF's phone did not stop ringing with complaint after complaint from car dealers.

90. Mr. Javier Robles was at the time ALF's employee and was in charge of dealing with the e-STEPS and Total Control GPS©.

91. Robles answered the frantic calls from dealers and tried to appease them.

92. TRAKSECURE's ineffective, limited out-of-the-box program caused dealers to lose clients waiting many hours to have a GPS unit installed on the vehicle they wanted to buy.

93. The dealers complained that sometimes it would take anywhere between five hours and even a day to install a GPS, frustrating the sale of the vehicle since the customer would get tired of waiting and cancel the whole transaction.

94. Dealers were furious with the business they were losing due to TRAKSECURE's inability to fulfill the services' requests on time.

95. In contrast, e-STEPS consistently installed a GPS **within just one hour**, once requested to do so

-16-

thru its platform and had a "ticket manager" module that e-STEPS developed and added to its initial tracking platform**.**

96.  In addition, complaints started within ALF's ranks because TRAKSECURE's system was too rigid and did not take into consideration many details and specific steps in the process of originating a loan that required flexibility, including all the stages and the eventual approval of the loan and money disbursement to the dealer, which had been engineered, designed, developed, integrated and provided by e-STEPS with its specialized knowledge and expertise in the development of IT integrated solutions, the protected trade secrets, and copyrights.

97.  e-STEPS had invested close to a year of meetings with ALF's personnel, hours of hard work of e-STEPS' own people in developing *software requirements*, workflow diagrams, the structure, sequence and organization of the platform with its source code so that it would do what it was supposed to do.

98.  e-STEPS had also invested enormous effort to fine-tune all the elements and components of the platform.

99.  In-house, at ALF, the complaints were increasing.

100.  ALF's president, codefendant, NICOLAS KOGAN, again ordered that TRAKSECURE's system be **"the same"** as e-STEPS' Total Control GPS© platform, or ALF would terminate the contract with TRAKSECURE.

101.  Additionally, both internal and external auditors as well as investors requested that the services received by both suppliers, e-STEPS and TRAKSECURE, had to be the same, specially the outputs generated by the Total Control GPS© platform, i.e. the invoices, the reports, the *Vehicle Condition Report* and the *Certificate of Installation* among other elements of the platform.

102.  On information and belief, simultaneously, codefendant KOGAN himself started boasting about e-STEPS' seamless and effective platform and would assure CENTERBRIDGE PARTNERS and

other potential investors that soon they would no longer need e-STEPS at all because ALF was developing an internal platform that together with TRAKSCURE would enable ALF to terminate its contract with e-STEPS.

103. KOGAN would instruct ALF's employees, Klaribel Guevara among others, to "show" these people the "live" operating platform from e-STEPS (Total Control GPS©).

104. However, the TRAKSECURE program was not shown because of its many problems and shortfalls.

105. What followed is a case-study of copyright infringement.

<u>**THE INFRINGEMENT - ACCESS**</u>

106. Mr. Javier Robles was ALF's employee in June 2016, and on or about then, was called by his direct supervisor codefendant RICARDO CRUZ to a meeting.

107. Codefendant RICARDO CRUZ was at the time the *Director of Business Development* at ALF.

108. Mr. Robles was the employee within the Business Development department in charge of everything related to the Total Control GPS© platform's performance e-STEPS' Total Control GPS© platform on ALF's side.

109. Mr. Robles was also the most knowledgeable ALF employee about everything related to the Total Control GPS© platform, its behavior, and its performance.

110. Mr. Robles had spent hours on end using the platform and had been the key validator, from ALF's perspective, of the painstaking efforts conducted by e-STEPS during the software requirements stage and the coding of the platform as it stands today.

111. During the year 2015, e-STEPS sent Mr. Robles all the requirements it was originally creating.

112. Robles validated and approved the requirements.

113.  e-STEPS would then code these requirements and further validate these elements as part of the platform.

-18-

114. Therefore, at the time, there was no one in ALF who knew how Total Control GPS© behaved and worked better than Mr. Robles.

115. Codefendant RICARDO CRUZ, Mr. Robles' supervisor, introduced Robles to codefendants VICTOR GARCIA PORRATA, LUIS O'FARRIL and Miguel Príncipe, introducing them as representatives from TRAKSECURE at a meeting at ALF.

116. CRUZ told Robles that TRAKSECURE had been contracted to sell GPS units to ALF and to provide ALF with the GPS tracking service for those units.

117. CRUZ immediately instructed Mr. Robles to "help" them in every way possible so that their software platform would behave and work the same as Total Control GPS© did.

118. After the meeting Mr. Robles warned CRUZ that he was not sure he could show TRAKSECURE how Total Control GPS© worked because of his concern that the information was confidential, but CRUZ instructed him to tell them everything he knew about Total Control GPS©' behavior and performance.

119. In fact, CRUZ told Mr. Robles that if it made him feel better, he didn't have to show TRAKSECURE the screenshots from Total Control GPS©, but that he had received orders from "high up" commanding him to transfer to TRAKSECURE all the knowledge Mr. Robles had of e-STEPS' Total Control GPS© platform, specifically its behavior and "the way it did things".

120. The transfer of e-STEPS' protected work mainly took place during meetings between Mr. Robles and codefendant Engineer LUIS O'FARRIL from TRAKSECURE.

121. First, Mr. Robles used TRAKSECURE'S out-of-the-box solution, Position Logic, for which it allegedly had a valid license.

122. Mr. Robles, seeing that TRAKSECURE's program consisted of a template of only one screen, told TRAKSECURE that the template alone would not work.

123. The only capability the Position Logic program provided by TRAKSECURE was the

passive tracking of the vehicles, but Mr. Robles realized this was only ONE of the modules that Total Control GPS© had, and it was not even a complete module at that because Total Control GPS© tracking module provided "live" tracking in addition to passive tracking, which was the only type of tracking that TRAKSECURE provided.

124.   Mr. Robles further told TRAKSECURE that they needed to know how orders were made; how the vehicles would be tracked; and that they needed a **ticket manager** that would handle the GPS unit's installation requests coming from the car dealers.

125.   TRAKSECURE said that it would provide the service, but was clueless.

126.   TRAKSECURE wanted the lienholders to have the GPS tracking systems installed after the deal closed by subsequent appointment on a different date because TRAKSECURE did not have the GPS unit suppliers ready.

127.   This proposal was totally unacceptable for ALF because it allowed a potential car buyer to leave the dealership to consider the decision to buy a vehicle, and ALF rejected it.

128.   TRAKSECURE originally handled GPS installation requests via email, which increased the lag time, while e-STEPS provided a fully automated solution.

129.   TRAKSECURE's programmers insistently asked Mr. Robles how e-STEPS did it.

130.   **As ordered by CRUZ who had received orders from "high up", Mr. Robles explained to TRAKSECURE, via O'FARRIL, how Total Control GPS© handled each step, each situation, each output from A to Z.**

131.   Mr. Robles called these sessions "Mesas de trabajo", or loosely translated, workshops or work meetings.

132.   For example, on one instance Mr. Robles communicated to O'FARRIL all the details about the ticket manager module that e-STEPS had added to Total Control GPS© out of e-STEPS' own creativity.

133.  Mr. Robles would use as sole reference his detailed knowledge of how Total Control GPS© behaved and would verbally communicate this to O'FARRIL.

134.  O'FARIIL would take notes, draw sketches and diagrams based on e-STEPS' *software requirements* and would depart with them.

135.  O'FARRIL would then code them based on Total Control GPS©'s structure, sequence, and organization and would therefore obtain the same behavior as e-STEPS' Total Control GPS©, but of course, without paying for it.

136.  On another occasion, Mr. Robles told O'FARRIL that all reports had to be produced by the platform or obtained through it and that they could not be produced by hand or compiled manually from different screenshots.

137.  After being asked how Total Control GPS© did it, Mr. Robles meticulously explained the reports produced by Total Control GPS©; the data that was on them; where the fields that populated the report would come from; which "screens" in Total Control GPS© showed those fields; and the elements of the database schema like the tables where the fields could be located and other details about the content of the reports.

138.  O'FARRIL would then leave and in a matter of hours would come back having produced the same behavior from its program that had taken e-STEPS so much effort, time, and money.

139.  The instructions that Mr. Robles was giving TRAKSECURE at ALF's behest were intended to cause TRAKSECURE's program to behave in the same way that e-STEPS' Total Control GPS© platform did.

140.  Specific to Total Control GPS© protected outputs, Mr. Robles told TRAKSECURE programmers that a "paper receipt" to certify the installation of the GPS units that ALF purchased from TRAKSECURE was not acceptable with loan audits and insisted that the receipt had to be produced digitally as e-STEPS Total Control GPS© did it.

141.  TRAKSECURE programmers could not determine how e-STEPS produced the certificate, so after several weeks of attempting to come up with a certificate, they just asked how e-STEPS did it.

142.  ORTEGA was present this time, on or around October 2016, when ALF, for reasons that will be discussed *infra* related to its intention of infringing and breaching its contract with e-STEPS, had internally placed the GPS unit under the oversight of the Collections department and removed it from the Business Development department.

143.  The Head of Collections was codefendant JOSÉ ORTEGA.

144.  A workshop was quickly scheduled to solve the certificate of installation issue and ORTEGA was present with Mr. Robles.

145.  ORTEGA himself handed the certificate the e-STEPS' platform produced to O'FARRIL and Mr. Robles explained how the data in the certificate was pulled by the platform from different tables within the database structure of e-STEPS' Total Control GPS© platform. *See* Exhibit 4

146.  The installation certificate is e-STEPS' protected work under the Copyright Act. *See* Exhibit 4

147.  TRAKSECURE programmers asked if they could take it with them, but ORTEGA told TRAKSECURE programmers: "You can photograph it, but you cannot take it with you".

148.  Right then, codefendant O'FARRIL took a picture of the certificate.

149.  Just a couple of hours later, Mr. Robles was instructed to access TRAKSECURE's program which was finally able to produce a strikingly similar certificate. *See* Exhibit 8 and compare with the certificate on Exhibit 4.

150.  Aside from minor cosmetic choices, an ordinary observer can establish the striking similarity of both certificates.

151.  Most important, both contain the same fields of data, both follow the same structural design and TRAKSECURE's certificate even has a seal in the same position as the one produced by Total

Control GPS© as well as the placement of the company logo. *Id.*

152. Mr. Robles also witnessed on several occasions how ALF employee Klaribel Guevara, acting under ORTEGA's orders, would show e-STEPS' platform to third parties, disclosing e-STEPS' protected work.

153. As part of ALF's internal procedures, auditors and investors would visit ALF and would review and inspect the loan files approved through both e-STEPS' Total Control GPS© platform and TRAKSECURE's program.

154. After comparing them, at least in one instance, the auditors said that TRAKSECURE'S program had to produce a "Vehicle Condition Report" like the one produced by e-STEPS' Total Control GPS© platform.

155. e-STEPS originally created the report during the requirements stage of the development of Total Control GPS©, so it constituted e-STEPS' protected work under Copyright Law.

156. However, TRAKSECURE copied it and its program started producing a substantially similar report.

157. In more than one meeting, codefendant engineer O'FARRILL was upset at not knowing how e-STEPS carried out certain tasks with their platform and would ask point blank how they did it, to which Mr. Robles responded – as ordered to him by his supervisor CRUZ – explaining to O'FARRILL e-STEPS' platform and each of the screens, its contents, fields, reports, certificates and other elements of the platform that ALF was prohibited from disclosing to third parties, and more so to a direct competitor of e-STEPS.

158. In a span of several weeks, Mr. Robles effectively communicated to TRAKSECURE, e-STEPS' competitor, his comprehensive knowledge of the Total Control GPS© platform's behavior, its structure, its sequence and its organization.

159. TRAKSECURE thus obtained from ALF sketches, diagrams, and notes, all based on Mr. Robles'

knowledge of e-STEPS' Total Control GPS© and they would depart ALF's offices with them. *See* Expert Witness Affidavit in Support of the Complaint, page 21.

160. Further, during the development of TRAKSECURE's program, TRAKSECURE engineers would meet with Mr. Robles to validate the changes to TRAKSECURE's program and Mr. Robles would approve them once they behaved like those elements in Total Control GPS© did.

161. Also, during the development of TRACKSECURE's program, when ALF was unaware of what software elements (features/components/interface) were needed to solve a certain goal, ALF consulted Total Control GPS©, either via Mr. Robles communicating his knowledge or by directly accessing Total Control GPS©.

162. As to the database schema, when the developers of TRAKSECURE needed to decide what kind of data was needed and the relation between those data (i.e. the database schema), the TRAKSECURE developers referred to Total Control GPS©.

163. After version 1 of TRAKSECURE's program failed to meet ALF's needs, TRAKSECURE engineers were instructed to create a new version that solved problems of version 1, via reference to Mr. Robles' knowledge of Total Control GPS©.

164. At decision making points, TRAKSECURE engineers used Total Control GPS© (either by using the platform or based on Mr. Robles' knowledge) to decide.

## THE INFRINGEMENT – SUBSTANTIAL SIMILARITY

165. As a result of the access provided by ALF to TRAKSECURE of e-STEPS' protected work comprised of the *software requirements*, non-literal elements of the protected software, functionality, structure, sequence, organization, components, modules, algorithms, data structures, and other elements, TRAKSECURE was able to produce a substantially similar program in a small fraction of the time, effort and costs that e-STEPS had to incur in developing its protected work. *See* Exhibit 5 page 14 (Economic Value of Software) and page 29 (Summary

of Conclusions)

166. A comparison of both programs and its elements will allow an ordinary observer to conclude that, overlooking its differences, they both have the same aesthetic appeal.

167. The conclusion based on Mr. Robles' descriptions of both software programs lead to the conclusion that they are substantially similar, since Robles which was in charge of handling those programs for ALF.

## ALF'S OWN DIRECT INFRINGEMENT OR BREACH OF CONTRACT OR BOTH

168. In addition to ALF's liability as a contributory infringer – as it knew of TRAKSECURE's direct infringement and substantially encouraged or assisted it – ALF itself directly infringed e-STEPS' copyrights.

169. As a result of the amount of value-added data generated by the e-STEPS Total Control GPS© ALF seized the opportunity and formally requested a "data file upload" from their vendors to be integrated directly with their internal Customer Relationship Management system to enhance their collection process.

170. As stated above, while TRAKSECURE was infringing e-STEPS' rights with ALF's contribution, ALF was doing its own share of infringement and contract breaching when it started developing, in-house, other platforms in its collections department that would feed from the tracking service provided by e-STEPS as a contracted service and protected from replication.

171. ALF had agreed by contract, as e-STEPS requested, that the only use they would give to the "data file upload" would be to preserve a historic backup.

172. ALF expressly agreed and released e-STEPS fully from any liability that would arise out of the illegal use of the data uploaded to conduct collection efforts in violation of Federal Law and in violation of the conditions agreed with car owners when they consented to the GPS installation.

173. ALF represented car owners that it would never use the GPS to obtain the vehicles' location for

anything other than recovering the vehicle and only if the account was more than three months delinquent.

174.  ALF is currently using Microsoft's Power BI software and has developed a dashboard that allows them to <u>track vehicles</u>, something that ALF expressly agreed NOT TO REPRODUCE as a service offered under the contract with e-STEPS.

175.  ALF eventually stopped using e-STEPS' tracking module and started its own tracking, therefore replicating e-STEPS' main line of business.

176.  ALF, instead of complying with its contractual obligations and federal law, decided that it would use the data produced by the GPS units to start reproducing e-STEPS' tracking business and injecting this data on the Power BI Dashboard for the benefit of its Accounts Receivable and Collections Department.

177.  Simultaneously with TRAKSECURE's infringement efforts, in-house developers of ALF started gathering from Mr. Robles or directly from the Total Control GPS© platform, copyright protected work belonging to e-STEPS platform that was being introduced and/or coded into ALF's internal dashboard tool.

178.  ALF and TRAKSECURE's illegal actions had as a goal of disposing altogether with e-STEPS, but only after having reproduced e-STEPS technologies, protected work, platform, and even business relationships, which it attempted to appropriate as well.

179.  ALF dismantled not only the Total Control GPS© platform, its functionality, and its efficacy, but the very nature of e-STEPS business and services to obtain profit.

## **THE AFTERMATH**

180.  The first step in ALF's goal to get rid of e-STEPS altogether was the complete halt of purchase orders for the GPS units that were installed in vehicles.

181.  ALF placed its last order at the end of December 2018.

182. Up until then, purchases had been between 250 and 300 units every month.

183. In January 2019, ALF's purchases dropped to zero and never resumed.

184. This complete halt of purchases was coupled with a surprising letter that ALF sent e-STEPS announcing its intention of terminating the contract effective April 15, 2019.

185. However, the intended termination could only apply to the monthly leased service since ALF ceased buying GPS units on January 1, 2019.

186. Sometime in January 2019, e-STEPS president, Mr. Eric Villegas, ran into Mr. Javier Robles, who was no longer ALF's employee.

187. When Mr. Villegas informed Mr. Robles that ALF had communicated its intention of ending the contract and that no purchases of GPS units had taken place since the beginning of the New Year, Mr. Robles came forward and explained how, flooded with complaints from dealers and ALF's own employees, codefendant KOGAN and other ALF's officials, including codefendants RICARDO CRUZ and JOSÉ ORTEGA instructed him to show TRAKSECURE exactly how e-STEPS platform behaved and offered its service so that TRAKSECURE could do the same.

188. Mr. Robles told Mr. Villegas that both CRUZ and later ORTEGA would tell him that the orders came from "high up" that the transfer of e-STEPS protected work should be carried out and given to TRAKSECURE.

189. "High up" meant codefendants KOGAN, ACUM and CORREA.

190. Therefore, in January 2019, e-STEPS learned that ALF, before or contemporaneously with its contract with TRAKSECURE, infringed its copyrights or misappropriated its trade secrets or both; interfered tortiously with its suppliers and their contractual obligations; and breached its contract with e-STEPS.

191. The infringement, misappropriation, and breach included, but was not limited to, the confidentiality agreement and revealing to TRAKSECURE information about e-STEPS'

processes, platform, and the functionality of the technology offered, and the infrastructure of e-STEPS so that TRAKSECURE could copy the technologies copyrighted and offered by e-STEPS, which e-STEPS trusted were protected under its contract with ALF to maintain its trade secrets secret.

192. ALF also misappropriated the copyrighted technologies, the confidential information gathered from e-STEPS and its trade secrets, all of which were protected under the contract, and used them to develop, in-house, **tracking and/or debt collection** applications, which it could not have done without violating the clause that restrained ALF from reproducing the technologies offered by e-STEPS as part of the contracted service.

193. During its commercial relationship with e-STEPS, ALF also gained knowledge of e-STEPS' suppliers of GPS units and M2M (machine to machine) services and initiated contact and private conversations with representatives of these entities to bypass e-STEPS, interfering with those contractual relationships.[1]

194. This tortious interference with e-STEPS' contractual and commercial relationships, inherently related to the essence of e-STEPS' business, extended to the M2M service providers TELEFONICA USA and CLARO, suppliers of e-STEPS as well.

195. ALF colluded and conspired with TRAKSECURE to dismantle e-STEPS' business, gather confidential information from e-STEPS and eventually drive e-STEPS out of business.

196. ALF inflicted the death blow in the New Year of 2019.

197. Right after Christmas 2018, ALF contacted e-STEPS, and even though the last meeting held by the parties in 2018 ended with ALF's representation that it would consider e-STEPS' offers giving ALF substantial discounts on GPS units, ALF wrongfully terminated the contract effective on April 15, 2019.

---

[1] An M2M service provider is usually a major telecommunications company that provides satellite connection between the GPS unit and the GPS tracking module of the Total Control GPS© platform. Please see paragraph 45 above and the contract at Exhibit 1, page 1.

198. As a result, e-STEPS has lost 90% of its recurrent income, thus virtually disappearing as a commercial entity.

199. e-STEPS incorporates and alleges as if fully set forth herein the statements of expert witness Eric Koskinen as they appear in Exhibit 5.

## III.   FIRST CLAIM FOR RELIEF – COPYRIGHT INFRINGEMENT - (17 U.S.C. § 501)

200. e-STEPSs repeats and realleges foregoing paragraphs, as if fully set forth herein.

201. The "Copyrighted Work" as the term is COLLECTIVELY defined in this complaint refers to the original works for which e-STEPS has registered its copyright and were created by e-STEPS on or about the time shown in the certificates of registration. *See* Exhibits 2, 3, and 4.

202. On information and belief, currently, ALF and TRAKSECURE use, operate, and commercially exploit for their economic benefit platforms, applications, software, mobile apps, which are based on e-STEPS' copyrighted work and behave substantially similar to e-STEPS' Copyrighted Work.

203. The Copyrighted Work is an original literary work containing copyrightable subject matter for which copyright protection exists under the Copyright Act, 17 U.S.C. § 101, et. seq. e-STEPS is the exclusive owner of rights under copyright in and to the Copyrighted Work. e-STEPS owns a valid copyright registration for the Copyrighted Work, attached as Exhibits 2, 3, and 4.

204. Through ALF's, TRAKSECURE's, and CENTERBRIDGE PARTNER''s conduct alleged herein, including the reproduction, unauthorized use and disclosure in violation of the contract of the Infringing Work, which is copied from and/or derivative of and substantially similar to e-STEPS Copyrighted Work, without e-STEPS' permission, <u>all Defendants</u> have directly, contributorily and/or vicariously infringed e-STEPS' exclusive rights in the Copyrighted Work in violation of Section 501 of the Copyright Act, 17 U.S.C. § 501.

205. On information and belief, Defendants' infringing conduct alleged herein was and continues to be willful and with full knowledge of e-STEPS' rights in the Copyrighted Work, and has enabled

Defendants illegally to obtain profit therefrom.

206.   As a direct and proximate result of Defendants' infringing conduct alleged herein, e-STEPS has been harmed and is entitled to damages in an amount to be proven at trial.

207.   Pursuant to 17 U.S.C. § 504(b), e-STEPS is also entitled to recovery of Defendants' profits attributable to Defendants' infringing conduct alleged herein, including from any and all income generated thru the use of the Infringing Work and products incorporating or embodying the Infringing Work, and an accounting of and a constructive trust with respect to such profits.

208.   e-STEPS further is entitled to its attorneys' fees and costs pursuant to 17 U.S.C. § 505.

209.   As a direct and proximate result of the Defendants' infringing conduct alleged herein, e-STEPS has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.

210.   On information and belief, unless Defendants' infringing conduct is enjoined by this Court, Defendants will continue to infringe the Copyrighted Work. e-STEPS therefore is entitled to permanent injunctive relief restraining and enjoining Defendants' ongoing infringing conduct.

211.   As part of the permanent injunctive relief, e-STEPS prays this Court to order the impoundment of all copies made or used in violation of e-STEPS' exclusive right and any and all other infringing articles or materials used to make infringing articles, including specifications, designs, diagrams, source code and object code pursuant to 17 U.S.C. § 503(a)(1).

### IV.  THE SECOND CLAIM FOR RELIEF – TRADE SECRETS MISAPPROPRIATION

212.   e-STEPS repeats and realleges the preceding paragraphs as if fully set forth herein.

213.   As the Law allows, Plaintiff hereby alleges in the alternative that if any claimed protected work under the Copyright Act would be determined to be unprotected then it is a trade secret protected by the Defend Trade Secrets Act of 2016.

214.   This is so because at the time of the facts alleged in this complaint no elements of the software

known as Total Control GPS© or the other protected works under the Copyright Act had been registered and therefore were secret and had not been disclosed to any entity other than ALF by e-STEPS, their rightful owner.

215.  e-STEPS owns business information as alleged above and derived independent economic value from that information not being generally known to or readily accessible by the public through proper means.

216.  e-STEPS took reasonable measures, including but not limited to an NDA agreement incorporated in full to the main contract with ALF, to keep this information secret.

217.  As alleged above, both ALF and TRAKSECURE disclosed or used, and continue to disclose or use, e-STEPS' trade secrets without its express or implied consent and both or either one of them used improper means to acquire knowledge of the trade secrets and at the time of disclosure or use, knew or had reason to know, that the knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets or derived from or through ALF who owed a duty to e-STEPS to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

218.  The trade secrets that defendants ALF and TRAKSECURE appropriated were used in interstate or foreign commerce through ALF's financing its business with investments from, inter alia, co-defendant CENTERBRIDGE PARTNERS, which does business in New York and Puerto Rico; through the importation of the GPS units from China and then California; and through the use of internet services that processed the loans, installed the GPS Units, and tracked the vehicles using servers that were and are located outside of Puerto Rico.

219.  Moreover, e-STEPS intended to use these trade secrets to expand its business within Puerto Rico and to the continental United States.

220.  Under the Defend Trade Secrets Act of 2016, 18 USCA § 1839, e-STEPS is entitled to an

injunction to preserve evidence and prevent trade secrets disclosure and further use, compensatory damages measured by actual loss and unjust enrichment, to the extent not accounted for in the actual loss calculation and exemplary damages of two times the amount of the damages for willful and malicious misappropriation.

221.   e-STEPS Total Control GPS© uses "IoT" (Internet of Things) technologies including Internet, Cloud and Telemetry for the servicing, tracking and maintenance of GPS Installations specific for the Total Control GPS© platform.

222.   All these technologies, plus the connections established through the M2M (machine to machine) services provided by major telecommunications companies like TELEFÓNICA USA and CLARO, are part of interstate commerce.

223.   The GPS units used to transfer the data points through "IoT" protocols into the Total Control GPS© platform were purchased through interstate or foreign commerce and are an intrinsic part of e-STEPS solution offering.

224.   Therefore, e-STEPS' trade secrets, at the time of the facts claimed in this complaint, were designed, developed, used and intended to be used in interstate commerce.

225.   e-STEPS is also entitled to reasonable attorneys' fees since the misappropriation in this case was willful and malicious as it has been alleged above.

226.   e-STEPS asks this Court to confiscate from defendants the platform, with all of its modules, that TRAKSECURE uses to provide service to ALF; the collection platform or any other related computer program that ALF may have developed by using the data from the GPS that e- STEPS has installed and that is managed through the platform that e-STEPS calls Total Control GPS©; any document, email, or written communication that is based on or mentions any concept, idea, or process from the copyrighted Functional Specification and all copies of such documents on the servers of ALF and TRAKSECURE, and whose "senders" or "receivers" are any employee,

officer, or independent contractor of ALF or TRAKSECURE, including, but not limited to, such emails from any employee of e-STEPS, and Nicolás Kogan, Carola Acum, Carlo Rodríguez, Klaribel Guevara, Ricardo Cruz, José Ortega, José Correa (IT),Chris Sánchez (IT), Javier Robles, and Juan Gutiérrez from ALF and from TRAKSECURE, Victor García, Luis O'Farril, and Neftalí Bernard from January 1, 2015 to the present.

## V.   THIRD CAUSE OF ACTION – COMPUTER FRAUD AND ABUSE ACT (18 USC § 1030 ET SEQ.)

227.   Under the Computer Fraud and Abuse Act, 18 USC § 1030 (g) a person who suffers damage or loss by reason of a violation of that section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief.

228.   Under section 1030(a)(4) whoever knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and **obtains anything of value** violates the Computer Fraud and Abuse Act, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period.

229.   The conduct alleged in this complaint against ALF as a contributory infringer with TRAKSECURE and as a direct infringer against e-STEPS (**Paragraphs 77 to 179**) was possible through and constitutes an illegal access to the Total Control GPS© platform, exceeding the authorized access under the limited license granted by e-STEPS in the contract with ALF, by which both ALF and TRAKSECURE obtained from e-STEPS something of value, namely its competitive advantage, protected work under the Copyright Act and/or trade secrets protected under the DTSA of 2016, all of them valued at more than $5,000 in any 1-year period, as claimed below in the **DAMAGES** section of this complaint**.**

## VI.   THE FOURTH CLAIM FOR RELIEF – BREACH OF THE AGREEMENT TO BUY GPS UNITS

230.   e-STEPS repeats and realleges the preceding paragraphs, as if fully set forth herein.

231. When the contractual relationship between ALF and e-STEPS began, ALF agreed to purchase certain quantities of GPS units that increased over time up to 1,000 units a month.

232. These projections were represented by ALF via email in order to obtain special pricing on the units and the services that e-STEPS would offer.

233. ALF never complied with its contractual obligation to buy 1,000 units, even though it used that commitment to deceive e-STEPS to get e-STEPS to discount its price per unit based on volume as to marginal profit per unit.

234. During the contract e-STEPS asked ALF to comply with its obligation, and, in a meeting held in June 2017, codefendant KOGAN, ALF's president and codefendant JOSÉ ORTEGA, at the time ALF's Risk Supervisor, agreed to buy between 250 and 300 units a month, since by that time TRAKSECURE also sold GPS units to ALF.

235. Until December 2018, ALF bought units as agreed in the June 2017 meeting, but starting in January 2019 and up to today, ALF stopped buying GPS units in compliance with its contract with e-STEPS.

236. e-STEPS notified the breach to ALF and demanded that it cure the breach in 30 days as the contract provided.

237. The 30 days ended on February 24, 2019 without ALF taking any remedial action.

238. e-STEPS demanded specific compliance from ALF with the contractual obligation to buy GPS units as the contract required and the agreement to buy between 250 and 300 units monthly for the 12 months of 2019 until the end of the renewed contract, that is, until **December 18, 2019**.

239. ALF never cured its default and instead reaffirmed its intention of terminating the contract on April 15, 2019.

## VII.  FIFTH CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH e-STEPS' BUSINESS RELATIONS WITH ITS SUPPLIERS AND OTHER BREACHES OF CONTRACT

240. e-STEPS repeats and realleges the preceding paragraphs hereof, as if fully set forth herein.

241. As part of the pattern employed by ALF to replicate e-STEPS technologies, ALF intentionally interfered with contracts that e-STEPS had entered with its suppliers to be able to comply with its contractual obligations with ALF.

242. For the sale of the GPS units, e-STEPS entered into a contract with a GPS supplier named CalAmp.

243. In January 2019, e-STEPS learned that ALF directly contacted CalAmp and obtained pricing information with the intent to buy GPS units directly from CalAmp and to cause the end of the distribution contract between e-STEPS and CalAmp.

244. Also starting in January 2019, ALF demanded from e-STEPS, directly and through counsel, that it produced "Authorization letters" so that e-STEPS' suppliers would provide tracking services directly to ALF or through a competitor of e-STEPS, namely TRAKSECURE.

245. The service with which ALF is intentionally interfering is part of the infrastructure that e-STEPS owns and operates and also part of the platform that constitutes e-STEPS' copyrighted intellectual property for tracking vehicles pursuant to the contract.

246. This conduct demonstrates ALF's ADDITIONAL intent to appropriate e-STEPS' business in the form of its relationships with suppliers which are an essential component of the service e-STEPS provides and the copyrighted technologies that e-STEPS uses to provide GPS tracking service.

247. The contracts interfered with by ALF between e-STEPS and its suppliers TELEFÓNICA USA and CLARO are in force and were in force at the time of the interference.

248. In addition, e-STEPS knows that ALF has caused, on its own or through TRAKSECURE, the removal of "SIM" ("Subscriber Identification Module") cards that belong to e-STEPS and that contain e-STEPS' confidential information protected by contract against disclosure to third parties and that those third parties can use to copy the technology and services that e-STEPS provides.

249. The aforesaid is another breach of the contract which prohibits copying technologies offered by e-STEPS under the contract and violates the license e-STEPS granted to ALF.

250. Moreover, the conduct alleged in paragraph 248 constitutes a breach of the confidentiality clause which prohibits ALF from revealing to a third party protected confidential information like the identification numbers in the "SIM" cards.

251. The conduct described in paragraph 248 also harms e-STEPS by interfering with contracts with third parties that are subject to specific terms that affect the "SIM" cards and tracking and localization of vehicles.

252. Once ALF caused the removal of the "SIM" cards, it did not give them to e-STEPS; thereby illegally appropriating e-STEPS' property.

253. Thus, e-STEPS asks this Court to order ALF and/or TRAKSECURE to immediately turn over any "SIM" cards that have been removed from the GPS units purchased from e-STEPS.

254. In the alternative, e-STEPS asks the court to order Defendants jointly and severally to pay e-STEPS $25.00 for each "SIM" card.

255. e-STEPS estimates that there are currently 8,000 "SIM" cards that belong to e-STEPS, the value of which at $25.00 a card is **TWO HUNDRED THOUSAND DOLLARS ($200,000.00)** which value e-STEPS seeks to be reimbursed by ALF and TRAKSECURE, jointly and severally.

256. ALF and TRAKSECURE have conspired to appropriate e-STEPS' protected property.

257. ALF and TRAKSECURE have obtained gains, profits, and advantage through their illegal conduct.

258. e-STEPS has suffered monetary damages as a result of ALF and TRAKSECURE's illegal acts.

## VIII.   PRIOR LITIGATION

259. Prior to registering its copyrights, e-STEPS sought to detain defendants' actions through a local state action in the Superior Court of San Juan for breach of the confidentiality clause, the prohibition of reproduction of technologies offered as part of the contract and for tortious interference with e-STEPS business relations. (Civil case SJ2019CV03257)

260. Citing ample discretion to grant injunctive relief, the lack of a copyright registration (which

would have taken away the court's subject matter jurisdiction) and without celebrating an evidentiary hearing to consider the preliminary injunction requested, the San Juan Superior Court dismissed the provisional remedy requested and ordered the case to follow the ordinary procedure of a cause of action of breach of contract. The case was thus reassigned to an ordinary civil court.

261.  The ordinary civil judge subsequently returned the case to the injunctions courtroom based on ALF's request for reconsideration of the injunctions court's denial of pretrial remedies (that had been already dismissed by a different injunction court and which dismissal with prejudice was confirmed by the Appellate Court's three-judge panel thus rendering the remedies as *res judicata*) alleging e-STEPS' refusal to perform elements of a contract that ALF cancelled and requesting compliance with other alleged elements that were not part of the contract.

262.  e-STEPS then filed a Complaint in this Court, which the Court dismissed because of a "lack of specificity about what is covered by the Total Control GPS copyright;" and the Complaint did not demonstrate how the Total Control GPS© and TRAKSECURE's infringing software were "substantially similar; lack of allegations as to substantial similarity between the Installer's Certificates; the lack of allegations about the use of the Trade Secrets in interstate commerce; and declined jurisdiction over the allegations of violations of Puerto Rico law. 19-1637 (CCC), Docket 42.

263.  e-STEPS attempts to remedy those defects with this Complaint.

264.  e-STEPS seeks a trial by jury.

## IX.   DAMAGES

265.  For the copyright infringements, in actual damages of no less than **THIRTEEN MILLION SEVEN HUNDRED THOUSAND DOLLARS ($13,700,000)** jointly and severally against all Defendants.

266.   For the misappropriation of trade secrets, as exemplary damages in double the amount to be proven at trial, jointly and severally against all Defendants.

267.   For the contractual breaches and tortious interference, e-STEPS seeks against all Defendants jointly and severally for their malicious and intentional actions, an amount no less than **FOUR MILLON FIVE HUNDRED THOUSAND DOLLARS ($4,500,000).**

## X.   SPECIFIC ALLEGATIONS AS TO A PERMANENT INJUNCTION

268.   e-STEPS seeks permanent injunctive relief prohibiting all Defendants from infringing its copyrights, directly or vicariously.

269.   The copying and/or use and/or disclosure and/or infringement by ALF and or TRAKSECURE of the technologies provided under the licensing of the tracking and location service, first is a copyright infringement, second, a misappropriation of trade secrets, third, breaches the contract, and fourth, is a tortious interference that caused e-STEPS to lose its competitive advantage forever. This is true given that the knowledge obtained by copying the technologies offered cannot be "unlearned" nor can the breach of the confidentiality contract be "undisclosed." Thus, only a bar to the use of the copyrighted material and the trade secrets will protect e-STEPS.

270.   In addition, e-STEPS should be provided the remedy of the prohibition of disclosing the copyright and/or confidential protected information obtained in breach of contract as a protective measure that, if not granted, would make any judgment moot or ineffective because the harm would be irreparable and irreversible.

271.   e-STEPS also very respectfully asks this Honorable Court to order the United States Marshall to confiscate the trade secrets**.**

272.   The additional preliminary remedies sought derive from the need to protect e-STEPS' copyrighted confidential information on the "SIM" cards together with proprietary right to the "SIM" cards that e-STEPS acquired through third party purchases (from Telefónica USA and Claro), and are part

of the infrastructure licensed by contract to ALF, which, if not granted would also expose e-STEPS to irreparable harm in its contractual relationships with third parties.

273.   The balance of the equities favors e-STEPS. e-STEPS will suffer an irreparable loss to its competitive advantage which "trade secrets", together with the copyrighted information, has been divulged to a competitor (TRAKSECURE) by ALF and said licensed technologies are protected by a use license.

274.   Defendants have copied and divulged to third parties these copyright infringements  copyright, misappropriation of trade secrets, and breach of contract, which could cause e-STEPS to have to cease operations versus obligating Defendants to comply with the copyright law, the Defend Trade Secrets Act, and their contractual obligations leaves e-STEPS entitled to the preliminary injunctive relief sought.

275.   Finally, the public interest will be served by having Defendants honor both federal and Puerto Rico law and their contractual obligations since the rule of law is meritorious.

## XI. PRAYER FOR RELIEF

**WHEREFORE,** plaintiff e-STEPS, LLC**,** very respectfully asks the Court for interim relief in the form of a Permanent Injunction, and, consistent with that, entry of a judgment against each and every Defendant as follows:

1.   Permanent injunctive relief restraining each Defendant and all those in active concert or participation with them, from:

(a)   further infringing on e-STEPS' Copyrighted Work and Trade Secrets and other Confidential Information by producing, distributing, selling, marketing, offering for sale, advertising, promoting, disposing of any products not authorized by e-STEPS;

(b)   making any statement or representation whatsoever that e-STEPS' Copyrighted Work, Trade Secrets and other Confidential Information belong to any of the Defendants;

(c)     effecting assignments or transfers; forming new entities or associations or using any other device for the purpose of circumventing; or otherwise avoiding the prohibitions in Subparagraphs (a) and (b);

(d)     secreting, destroying, altering, removing, or otherwise dealing with the work for hire produced for plaintiffs or any books or records which may contain any information relating to the importing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, or displaying of any of the copyrighted and/or confidential information;

(e)     aiding, assisting, or abetting any other individual or entity in doing any act prohibited by sub-paragraphs (a), (b),(c), or (d).

2.     Directing that Defendants deliver all copyrighted and confidential information, including, but not limited to source codes and any other related product not limited to documentation and access to cloud servers, in their possession or under their control to the marshal who executes the seizure.

3.     Directing that each Defendant report to this Court within ten (10) days after a Preliminary and/or Permanent Injunction judgment is entered to show its compliance with paragraphs 1 and 2 above.

4.     Directing any other such relief as the Court may deem appropriate to prevent the trade and public from gaining the erroneous impression that the copyrighted, trade secrets, and/or confidential information owned by e-STEPSs is owned by Defendants.

5.     Directing Defendants to return all assets and copies thereof of e-STEPS in their possession.

6.     Directing Defendants to provide an accounting of their profits attributable to Defendants' infringing Plaintiffs' copyrights.

7.     Directing Defendants to destroy or delivery up for destruction all materials in their possession, custody, or control used by Defendants in connection with Defendants' infringing products, including, without limitation, all copies of the infringing material and any products and works that embody any reproduction or other copy or colorable imitation of the copyrighted works, as well as all means for making them.

8.     Directing the United States Marshal to confiscate the trade secrets belonging to e-STEPS,

detailed above in paragraph 47.

9.      That e-STEPS be awarded jointly and severally from the Defendants the e-STEPS' losses and each Defendants' profits in an amount of no less than **THIRTEEN MILLION SEVEN HUNDRED THOUSAND DOLLARS (**$13,700,000) for the copyright infringements.

10.     For the misappropriation of trade secrets, as exemplary damages in double the amount to be proven at trial, jointly and severally against all Defendants.

11.     For the contractual breaches and tortious interference, e-STEPS seeks against all Defendants jointly and severally for their malicious and intentional actions, an amount no less than **FOUR MILLON FIVE HUNDRED THOUSAND DOLLARS ($4,500,000)**

12.     That e-STEPS be awarded an amount for the damages caused by Defendants' misappropriation of its trade secrets of an amount to be proven at trial.

13.     That e-STEPS be reimbursed all their expenses of this project, in an amount not less than $250,000.

14.     That e-STEPS be awarded costs from each Defendant, including attorneys' fees, based on Defendants' temerity.

15.     That Defendants pay e-STEPS pre-judgment and post-judgment interest.

16.     That the Court consider a referral to the U.S. Attorney if it deems such a referral is warranted.

**I HEREBY CERTIFY** that I have filed this Complaint with the Court's ecf system.


Dated: May 28, 2020

In San Juan, Puerto Rico.

Respectfully submitted.


**FOR PLAINTIFF**
**e-STEPS, LLC**

**BECKER & VISSEPÓ, PSC**

S/Jane Becker Whitaker/
**JANE BECKER WHITAKER**
(787) 945-2406
USDC No. 205110
E-mail: jbw@beckervissepo.com
janebeckerwhitaker@gmail.com


S/Jean Paul Vissepó Garriga/
**JEAN PAUL VISSEPÓ GARRIGA**
USDC No. 221504
E-mail:jpv@beckervissepo.com
 jp@vissepolaw.com
PO Box 9023914
San Juan, PR 00902-3914
Tel. (787) 633-9601


S/Pedro J. Rivera-Rivera
**PEDRO J. RIVERA RIVERA**
1510 Ave. FD Roosevelt Ste 9B-1
Guaynabo, PR 00968
Tel. 787-758-8029; Fax 787-754-0109
Mobile 787-599-3702
E-mail: pjrivera@pjrlex.com